Filed 7/30/24  City of Irvine v. Kingston Kohr, LLC CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CITY OF IRVINE, | |
| Plaintiff and Respondent, | G061805, G061821, G061858 |
| v. | (Super. Ct. No. 30-2022-01261652) |
| KINGSTON KOHR, LLC, | O P I N I O N |
| Defendant and Appellant. | |

Consolidated appeal from orders of the Superior Court of Orange County, Sandy N. Leal, Judge.  Affirmed.  Appellant's motion to augment the record.  Granted.

Carney Mehr and Kendra Carney Mehr for Defendant and Appellant.

Rutan & Tucker and Noam Duzman for Plaintiff and Respondent.

This consolidated appeal stems from a nuisance abatement action initiated by the City of Irvine (the City) after a fire destroyed the roof of a 26,000 square foot industrial building owned by appellant Kingston Kohr, LLC (Owner), leaving the concrete tilt-up walls at risk of collapse. Owner appeals from three related orders issued by the trial court: the inspection and abatement warrant that authorized the City to enter Owner's property (the Property) and demolish the building (the warrant, or the abatement warrant), an extension of the warrant, and the denial of Owner's motion to quash the warrant. Owner does not dispute the building was a nuisance subject to abatement and that it elected to demolish, rather than repair, the structure. Nevertheless, Owner contends the City deprived it of due process by obtaining the abatement warrant without showing (1) it gave Owner the opportunity to demolish the building itself and (2) Owner was unable or unwilling to do so.

We affirm. The trial court's orders are supported by substantial evidence that the City complied with Owner's due process rights before seeking the warrant to demolish Owner's building. The City gave Owner notice and an opportunity to be heard and a reasonable opportunity to elect to repair its building before the City proceeded with demolition. We disagree with Owner's contention that, once it elected not to repair the building, it had a due process right to conduct the demolition itself to control or minimize demolition costs. In any event, substantial evidence supports the conclusion that the City attempted to give Owner that opportunity and did not act unreasonably in imposing conditions on the issuance of a demolition permit to Owner.

2

# PROCEDURAL HISTORY

## I.

### THE CITY'S FIRST ABATEMENT WARRANT

A fire occurred at the Property on February 2, 2020, damaging the roof of the industrial building located on it. Two years later, on March 8, 2022, the City first applied to the trial court for a nuisance abatement warrant pursuant to Code of Civil Procedure section 1822.50 et seq., seeking authority to demolish the building.[1] The City's ex parte application was supported by a declaration from the City's chief building official/building and safety manager and supporting exhibits. The court granted the application and issued the abatement warrant on March 8, 2022, with an effective date of March 10, 2022. The warrant was valid for 14 days. The City later applied to the court and obtained an extension of the warrant to April 6, 2022.

On March 30, 2022, Owner sought an ex parte order quashing the warrant. Owner contended it "has never disputed the fire-damaged structure is a danger and must be abated [and that Owner has] only reasonably requested additional time to do so." Among other things, Owner argued the warrant should be quashed because the City failed to show Owner was unable or unwilling to do the abatement itself and the declaration submitted by the City in support of the application omitted material facts and was misleading. The City requested additional time to oppose Owner's motion. The court set a hearing on Owner's motion to quash for April 11, 2022.

---

[1] Appellant's unopposed motion to augment the record on appeal with pleadings and other records filed with the trial court is granted pursuant to California Rules of Court, rule 8.155(a)(1)(A).

3

Shortly before the hearing, the parties filed a stipulation in which Owner agreed to take its motion to quash off calendar without prejudice to the City's ability to renew its application for an inspection and abatement warrant (with five business days' notice to Owner) and to oppose the arguments made by Owner in its motion to quash. The court entered the stipulation as an order on April 11, 2022, and took Owner's motion to quash the warrant off calendar. The first abatement warrant expired by its own terms.

II.

THE CITY'S SECOND APPLICATION FOR ABATEMENT WARRANT
AND OWNER'S MOTION TO QUASH

Approximately seven weeks later, on May 24, 2022, the City filed a second application with the trial court for an inspection and abatement warrant, again seeking approval to abate the nuisance on the Property by demolishing the building. Like the City's prior application, the second application was supported by a declaration (with exhibits) from the City's chief building official/building and safety manager. This time, however, Owner was given notice and the matter was scheduled for a hearing. Although Owner did not dispute the building was a danger and should be demolished, it filed an opposition to the City's second application, also supported by declarations and exhibits. On July 14, 2022, the court heard testimony from Owner's managing member, as well as oral argument from counsel for both parties.

The following is a summary of the evidence before the trial court in connection with the City's second application, Owner's opposition thereto, and Owner's motion to quash. Because Owner elected to proceed on appeal without submitting a record of the July 14 evidentiary hearing and oral

4

argument, either in the form of a reporter's transcript or substitute therefor, this summary does not reflect the testimony given by Owner's managing member.

Following the fire, the City deemed the Property a danger to public safety and red-tagged it as unsafe. A city inspector determined a strong wind or moderate seismic event could cause the building to collapse. The inspector also determined bracing was required on the surviving structural walls to provide lateral support. On February 10, 2020, the City issued a "Pre-Citation Correction Notice" to Owner, directing Owner to brace all exterior walls no later than February 18, 2020. When Owner did not comply, the City issued administrative citations on February 20 and February 25, 2020.

By March 27, 2020—almost two months after the fire—Owner had neither contacted the City nor braced the walls, so the City obtained a bid to install the bracing itself. On March 31, 2020, the city attorney sent a letter to Owner entitled, "Notice of Violation." The letter demanded Owner contact the City and outlined the two options available to Owner to remediate the Property: (1) repair the building, which would require bracing the tilt-up panels within 15 days and then rebuilding within 120 days (by July 29, 2020), or (2) demolish the building within 30 days of securing permits from the City, after confirming no asbestos remediation was necessary. The notice of violation warned Owner that failure to remediate the Property would result in the City assessing its legal options, including "utilizing the City's own and/or retained forces to abate the violations . . . and/or taking any other legal steps to address the violations at the Property."

5

On April 4, 2020, Owner responded by e-mail to the notice of violation. Owner said its goal was the "same as [the City's] goal" but that it had encountered roadblocks.[2] Owner did not say whether it intended to rebuild or demolish the building, and it offered no specific date by which it would take action. Two days later, the city attorney responded by e-mail, stating "time is of the essence," asking the Owner to contact him to discuss the matter, and warning the City might move forward to demolish the building at Owner's expense.

On April 9, 2020, a representative of Owner spoke with the city attorney. The next day, Owner sent an e-mail to the city attorney describing issues Owner had encountered in determining how to brace the building and securing a contractor to do the work. Owner referred to a pending fire investigation and to a concern it said had been raised by a contractor that might affect that investigation. Owner asked the city attorney if bracing could occur without removing the debris and said the bracing could be done within 15 days if debris removal were not required. Owner represented it would provide feedback to the City on remediation solutions by April 14, 2020. Owner also asked for an extension of time to rebuild the structure should it choose that option and indicated that, if the City were unwilling to grant an extension, Owner would have to choose demolition, which in turn would require the Owner to obtain the fire investigator's input to devise a solution.

---

[2] According to Owner, its failure to brace the building was caused by a lack of insurance funds to perform the work. Owner's insurance carrier initially provided a contractor to perform the bracing work, but called off the work when the carrier determined there was no coverage for the fire. That led to a separate dispute between Owner and Owner's tenant; Owner contended the tenant was responsible for the fire.

6

Also on April 10, 2020, the City received a bid from a contractor to brace the building in preparation for the possibility Owner would not meet the deadlines in the notice of violation.

On April 16, 2020, having heard nothing further from Owner, the city attorney sent an e-mail to Owner, stating "[t]he City is losing confidence that you will be able to quickly repair the structure as required on your own and it appears to us that we will have to abate it on your behalf." The city attorney asked for a conference call for the following day. Owner responded the next day, stating it was available for a meeting that morning and that it was "waiting on feedback from the general contractor and the structural engineer to make plans for bracing inside [the building]." Owner asked the city attorney to respond to Owner's April 10 e-mail. The city attorney responded with an e-mail confirming the conference call, attaching a copy of the proposal the City obtained for the bracing work, and advising that Owner would have to pay the contractor a full 100 percent retainer to begin the bracing work.

On April 17, 2020, the city attorney sent another e-mail to Owner confirming Owner must proceed immediately to brace the building, but agreeing to extend the deadline by six months (to October 14, 2020) for Owner to bring the building into full compliance. The e-mail gave the Owner 60 days (to June 16, 2020) to secure all necessary permits for the remediation. The city attorney reiterated that if Owner did not do the work expeditiously and in good faith, the City would proceed with the abatement itself and file a lien against the Property for the costs it incurred to do so.

On April 21, 2020, the city attorney inquired about the Owner's plan and timeline for bracing the panels. Owner responded it still had not

decided whether to elect bracing and rebuilding or demolition, but said in light of the limited time the City was giving to Owner to rebuild, it might opt for demolition.

On Friday, April 24, 2020, the city attorney e-mailed Owner demanding that Owner communicate its decision to either brace and rebuild or demolish by noon on Monday, April 27, 2020. Owner did not respond by that deadline. Instead, Owner e-mailed the city attorney on April 30, 2020, offering reasons why it missed the deadline and assuring the City it was actively working on the issue. Owner asked the City for more flexibility with the "rebuild timing."

On May 1, 2020, the city attorney e-mailed Owner that the City was moving forward to obtain city council approval to abate the Property, but if Owner promptly submitted a permit application and plans for bracing and obtaining permits, the City would reassess this course of action. The city attorney stated the City required a structural plan for bracing the concrete tilt-up panels, which "is not complicated at all," and provided a basic outline of the information a structural engineer would need to give the City to obtain a permit for the bracing. The city attorney further explained that, according to the City's chief building official/building and safety manager, it should not take the Owner more than one or two days to prepare the necessary plans.

Another five days passed, and when Owner did not respond, the city attorney followed up with another e-mail on May 6, 2020. On May 8, 2020, Owner said it would respond later that day.

On May 9, 2020, Owner e-mailed the city attorney saying it would likely elect to demolish the structure because the deadline imposed by the City to rebuild was not feasible. Although Owner said it was waiting for a

8

contractor to respond and would make the decision "very soon," the City heard nothing from the Owner for another month.

On June 9, 2020, the Irvine City Council met and adopted Resolution No. 20-45 (Resolution 20-45) declaring the Property a public nuisance as defined in Civil Code section 3480 and Irvine Municipal Code section 4-11-101 and giving the Owner the same options the city attorney had conveyed to Owner in March 2020. Resolution 20-45 ordered "the owner of the Property to abate the nuisance conditions by either (1) demolishing the entire structure within 30 days or (2) bracing the concrete tilt-up panels and exterior walls of the structure that were damaged within 7 days and then fully rehabilitating the structure within 6 months." Resolution 20-45 further stated: "If the nuisances are not completely abated by the owner as directed within the thirty-day period, the City shall cause the same to be abated by the City personnel or private contract, . . . The owner of the premises shall be liable to the City for all costs of the abatement, including administrative costs." Owner received notice of the city council hearing on proposed Resolution 20-45 a few days prior to the June 9 hearing and submitted a written comment. Owner knew Resolution 20-45 was adopted, as it participated in the June 9 hearing online.

On July 8, 2020, one month after the City adopted Resolution 20-45 declaring the Property a nuisance, Owner's attorney prepared a letter to the city attorney requesting another 30 days (to August 7, 2020) "to complete abatement." Owner claimed it needed the additional time because the Property had to be preserved in its current condition due to Owner's claimed ongoing investigation regarding the cause of the fire. The letter stated Owner

9

"has hired a contractor to begin bracing the exterior walls of the structure immediately to abate the property," and bracing is a "necessary cost."

Despite Owner's representation it had a contractor in place to begin bracing the walls immediately, the bracing did not happen. Instead, on July 15, 2020, Owner attempted to contact the City's chief building official/building and safety manager to talk about the terms for bracing the Property. The city attorney responded to Owner and referred Owner to his May 1, 2020 e-mail, which had already outlined the requirements to obtain a bracing permit.

On July 28, 2020, Owner's attorney informed the City that Owner would be unable to meet the City's deadlines, based on the opinion of one or more unidentified "contractors/engineers who specialize in restoration of fire-damaged properties."[3] By this date, almost six months after the fire, Owner still had not braced the Property or applied for a bracing permit.

Then, more than another month elapsed. On September 9, 2020, the City and Owner entered into an "Extension of Time for Abatement Agreement" (Agreement 1). Owner acknowledged in Agreement 1 the deadlines and requirements imposed on it by the City as part of Resolution 20-45 and also acknowledged it had neither timely demolished the Property nor performed the bracing work, despite having requested (and received) an extension of time to remedy the violations on the Property. Pursuant to Agreement 1, Owner agreed to complete the bracing work on the Property within 28 calendar days—i.e., by October 7, 2020—including submitting plans

---

[3] There is no evidence in the record from any contractor, engineer, or other expert supporting Owner's assertions that the City's deadlines were impossible to meet.

10

to the City and obtaining the requisite permits. In addition, in Agreement 1, the City gave Owner yet another opportunity to elect whether to demolish the building or rehabilitate it. Agreement 1 provided that if Owner elected to demolish the building, it would have to submit plans, obtain building permits, and complete the demolition within 120 days—by January 7, 2021. Owner paid the City a $50,000 conditionally-refundable cash deposit pursuant to Agreement 1 to "secure the faithful performance of [Agreement 1] and to pay for the demolition of the Property in the event the Company for any reason fails to comply with any of the . . . deadlines stated herein."

On September 11, 2020, seven months after the fire, Owner submitted plans to the City to brace the building, but it failed to submit the necessary permit application and the City's required plan check fee. During the following week, the City reviewed Owner's plans and reminded Owner it had to submit a permit application and plan check fee. Owner submitted the permit application and, after initially disputing the fee, paid the plan check fee on September 18, 2020.

The City's plan check engineer provided informal plan check corrections to Owner's engineer on September 21, 2020. But Owner's engineer responded that it was not the submitting party and asked the City to provide its formal plan check review directly to Owner. The engineer told the City his company had not been paid by Owner for its services on the project. In a subsequent e-mail to the City's principal plan check engineer, the engineer noted "the building has been left in an unsafe condition, by the owner, for many months."

The City provided its formal plan check corrections to Owner the next day, September 22, 2020. As part of those corrections, the City notified

11

Owner that if, as the plans indicated, it now proposed to brace the building from the outside by tying the braces to the foundation of the adjacent building (which Owner also owned), the adjacent building could not be occupied.

A week later, on September 29, 2020, Owner's representative contacted the City with questions about the plan review comments. Between October 2 and October 6, 2020, Owner and the City corresponded regarding the City's determination that, if the building were braced from the outside as Owner had proposed, the adjacent building would have to remain vacant. Owner did not modify its bracing plans based on the City's comments. Instead, Owner took the position the City had breached Agreement 1, which provided: "City agrees to allow [Owner] to open the adjacent property . . . for leasing and business operations immediately after [Owner] has completed bracing of the Property." Owner argued the City knew about Owner's outside bracing plan when it signed Agreement 1, so the City should allow Owner to both brace the damaged building from the outside and occupy the adjacent building. According to the City, Owner's request to brace from outside using the adjacent building would require a detailed analysis by Owner's engineer to demonstrate the adjacent building's walls had sufficient strength and stiffness to support the applicable loads. Owner failed to provide such an analysis.

Owner did not meet the deadlines set forth in Agreement 1 to secure a bracing permit, complete the bracing work, or submit feasibility plans from a licensed contractor regarding the possibility of rehabilitating the building. Accordingly, on October 14, 2020, the city attorney sent a letter to Owner declaring Owner in material breach of Agreement 1 and notifying Owner it had forfeited the $50,000 deposit. The city attorney's letter advised Owner the City would move forward to either demolish or rehabilitate the

12

building itself.  The city attorney stated Resolution 20-45 ordering abatement "is now re-instated, and [Owner] must [immediately] cease any additional work on the Property."

On October 15, 2020, Owner's attorney sent a letter to the City. Owner disagreed it was in breach of Agreement 1 and asserted that the City's actions caused delay, including the City's attempt to modify the terms of Agreement 1 in a way that made it impossible for Owner to meet the City's deadlines.  The city attorney responded on December 3, 2020, disputing Owner's assertions and stating Owner had refused to act in good faith.

On December 10, 2020, the City entered into a contract with a third party to prepare demolition drawings to demolish the Property.

On December 15, 2020, Owner e-mailed the City's director of community development (the Director) that it was awaiting a response from the City's planner to an e-mail Owner had sent on October 6, 2020.  In the December 15 e- mail, Owner asked for help to allow it to "proceed with abatement."  Owner stated demolition by the City is "really unnecessary, as [Owner has] been ready to abate and [doesn't] need the city to do this."  On December 17, 2020, Owner's representative spoke by telephone with the Director.  In an e-mail sent to Owner the same evening, the Director wrote: "As I stated, the City is now moving forward with [the] selection of a contractor for demolition of the property and that preparation work will continue.  On our phone call, you stated that the property owner is now interested in demolishing the property as well.  While I make no commitments, we are willing to take a look at your plan and timeline for demolition and evaluate it in the interest of finding the most expedient path toward ensuring public safety."

On December 18, 2020, Owner e-mailed the Director proposing a timeframe of 45 to 73 days to complete demolition and asked, "[w]ould you like me to start right away?" On December 21, 2020, the Director responded to Owner that the building and safety team needed to evaluate the timeline and, in light of the impending holidays, the Director would get back to Owner the following week. The next day, Owner wrote to the Director stating, "I'm now confident we are moving in a successful direction to *swiftly abate the building.*" (Italics added.)

Owner followed up with the City again on December 30, 2020. That day, the Director responded to Owner and stated the City was drawing up an agreement that would allow Owner to perform the demolition itself based on the timeline Owner had provided. The Director said the City was attempting to reach Owner's attorney to get the agreement drafted, but the attorney was out of town until Monday. The Director said, "[t]he sooner he hears back [from Owner's attorney,] the sooner we can get the agreement in place."

On January 4, 2021, the City informed Owner's attorney it would accept the deadlines proposed by Owner but would nevertheless continue with its own plans for demolition; in either event, the City advised Owner it expected the building to be demolished by mid-February 2021. In an e-mail put into evidence by Owner, Owner's own attorney notified Owner that the City's agreement to allow Owner to conduct the demolition was contingent on Owner's agreement to reimburse the City for costs incurred in the process and Owner's attorney needed to draft a new agreement to reflect that requirement "before you can move forward with demolition." Owner's attorney advised Owner to "move at the speed of lightning and beat the City to the demolition

14

as soon as the parties have a new contract," and further advised that "[i]f the City sees you meeting each deadline as scheduled, they would be less inclined to move forward with their demolition plans." Owner's counsel emphasized to his client: "This is a parallel course of demolition, and to avoid duplicative costs and efforts, you would have to beat the City out on all the plans to demolish."

Despite the admonition by Owner's own attorney that Owner should "move at the speed of lightning," weeks went by. On or about January 28, 2021, the parties exchanged competing proposed agreements for demolition of the Property by Owner (proposed Agreement 2). The City's proposed Agreement 2 confirmed Owner's proposed schedule to complete the demolition within 75 days was acceptable to the City, with the caveat that the City would continue with its own demolition plan "to proceed alongside with [Owner's] scheduled demolition plan" to ensure the demolition would proceed "expeditiously and without delay." The City's proposed Agreement 2 also stated the City would issue Owner a permit for demolition—but only upon Owner's execution of proposed Agreement 2—and would agree not to interfere with Owner's demolition. As for the City's costs for demolition, the City's proposal provided that the $50,000 deposit Owner had furnished to the City in connection with Agreement 1 would be refunded to Owner after Owner had completed the demolition on the terms in the Agreement, but that City could deduct from the deposit any reasonable demolition costs the City "has incurred or does incur in the future." The City's proposed Agreement 2 also provided that, if Owner did not comply with the deadlines set forth in it, the City could use the cash deposit to cover all reasonable costs associated with the City undertaking the demolition; in the event the City's reasonable costs

15

exceeded the amount of the cash deposit, Owner would pay the difference within 90 days of invoice and, if unpaid, the City could record the unpaid amount as a lien against the Property or assess it as a special assessment.

On February 1, 2021, Owner reached out to the City, including the Director, asserting that the Director had agreed in December to allow Owner to do the demolition itself and Owner had already started connecting with contractors to update bids. Owner asked the City to hold off doing any parallel work. Owner said it would have the project finished in 75 workdays and that it was "ahead of schedule." The Director responded that the City would move ahead in parallel with the Owner's preparation for demolition so the City would be prepared to step in and promptly initiate the demolition in the event Owner did not complete it in a timely fashion. The Director stated, "we will need the signed [proposed Agreement 2] from you before we will issue a demolition permit." The Director also reminded Owner the City's draft of proposed Agreement 2 was still being reviewed by Owner's attorney.

Owner did not sign proposed Agreement 2. Instead, Owner prepared a revised draft of proposed Agreement 2 that deleted all references to the City undertaking a parallel demolition. Owner's proposed Agreement 2 provided the City could not assess and recoup costs from Owner for any work done by the City in connection with demolition unless and until Owner failed to comply with the 75-day deadline.

On February 5, 2021, a consultant retained by the City inspected the Property and confirmed extensive damage to the building; indeed, the inspector concluded the walls were so unstable the building might collapse. The inspector notified the City that "[w]e consider this an emergency causing life safety concern" and recommended temporary bracing be done to shore the

16

east wall. By that date, Owner had not provided a response to the City regarding proposed Agreement 2 or the City's required demolition schedule.

On February 8, 2021, approximately 40 days after Owner's December conversation with the Director in which Owner indicated it was ready to immediately begin a swift demolition—and more than one year after the fire—Owner applied for a demolition permit from the City. The City reviewed the application and was prepared to issue a demolition permit but would not do so because Owner refused to enter into the City's proposed Agreement 2. Owner and the City never entered into any version of proposed Agreement 2.

From April to November 2021, the City solicited proposals for the demolition of the Property. The City awarded a contract on December 28, 2021, to a third party to perform the demolition. It issued a purchase order for the work on February 11, 2022, and sought its first nuisance abatement warrant from the court shortly thereafter, on March 8, 2022.

III.

THE COURT'S RULINGS

On July 14, 2022, after hearing live testimony from Owner's representative and argument by both parties' counsel, the trial court granted the City's application for an abatement warrant and denied Owner's motion to quash the abatement warrant. On July 27, 2022, and again on August 10, 2022, the City applied to the court for extensions of the warrant. Both applications were supported by declarations from the City's chief building official/building and safety manager explaining the need for the extensions

17

and describing the partial work already performed.  The court granted both extensions.[4]

The City completed demolition of the Property on or about August 16, 2022.[5]  It returned the warrant on August 30, 2022, and the trial court approved the return on September 1, 2022.

After the building had been demolished, Owner filed a notice of appeal of the trial court's July 14, 2022 order issuing the abatement warrant, a notice of appeal of the court's July 19, 2022 order denying Owner's motion to quash the warrant, and a notice of appeal of the court's July 27, 2022 order extending the abatement warrant.  We granted Owner's unopposed motion to consolidate the three separate appeals.

## DISCUSSION

Owner contends the trial court erred by issuing and extending the abatement warrant and denying Owner's motion to quash the warrant because the City failed to meet its burden of showing it complied with Owner's

---

[4]  The trial court denied Owner's ex parte application for reconsideration of the order granting the abatement warrant.  Owner did not properly appeal that order.  Although Owner attached the minute order denying reconsideration to its notice of appeal of the July 27, 2022 order extending the abatement warrant, it did not file a separate notice of appeal as to the order denying reconsideration.  Owner also did not either include the denial of reconsideration in its list of issues presented on appeal or brief the issue.  We therefore consider the issue waived.  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.)  In any event, because Owner asked the trial court to reconsider its order issuing the abatement warrant and we find no error in that order, this appeal necessarily disposes of any argument Owner might have asserted that the reconsideration motion should have been granted and the abatement warrant recalled.

[5]  Owner did not seek a writ from this court or otherwise seek to stay either the abatement warrant or the extensions of it.

18

due process rights prior to obtaining the warrant and demolishing Owner's building.  Specifically, Owner contends it was ready, willing, and able to do the demolition itself, but the City unreasonably conditioned the issuance of a demolition permit on Owner agreeing to reimburse the City for costs associated with a parallel demolition process Owner contends was unnecessary.  Owner argues it had a due process right to perform the demolition itself.  We reject Owner's contentions.

## I.

### STANDARD OF REVIEW

"[A] judgment or order of the trial court is presumed correct and prejudicial error must be affirmatively shown.  [Citation.]  'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court.  "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented."'" (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187.)  To overcome this presumption, appellants must provide an adequate record that demonstrates error.  (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.)  Where, as here, an appellant fails to provide the reviewing court with pertinent reporter's transcripts (or a suitable substitute), we presume the evidence supports the trial court's rulings unless error appears on the face of the record.  (Cal. Rules of Court, rule 8.163; *National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 521–522.)[6]

---

[6]  Owner failed to provide a complete record on appeal, including all the evidence the trial court considered in ruling on the City's application for the abatement warrant.  The hearing on the City's application included live

19

On appeal, we review factual issues underlying the trial court's abatement warrant under the substantial evidence standard. (*Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 284; *People v. Wheeler* (1973) 30 Cal.App.3d 282, 292.) Under that test, the power of this court begins and ends with a determination whether there is any substantial evidence in the record, contradicted or uncontradicted, that supports the trial court's findings, and "[w]hen two or more inferences can be reasonably deduced from those facts, the reviewing court has no power to substitute its deductions for those of the fact finder." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 374.) Issues concerning the application of statutory authority present questions of law subject to independent review of the trial court's rulings. (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083–1084.) Legal issues, including the scope of due process rights, are reviewed de novo. (*People v. Aguilera* (2020) 50 Cal.App.5th 894, 909; see *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169 [the ultimate determination of whether administrative proceedings were fundamentally fair is a question of law].)

---

testimony from Owner's agent. Without a reporter's transcript, we are unable to review all evidence before the trial court. (See Cal. Rules of Court, rule 8.120(b) ["If an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court, the record on appeal must include a record of these oral proceedings"].) Generally, appellants in ordinary civil appeals must provide a reporter's transcript at their own expense. (*City of Rohnert Park v. Superior Court* (1983) 146 Cal.App.3d 420, 430–431.)

## II.

### APPEALABILITY

We first address whether the orders appealed from are in fact appealable. We conclude they are. Although the challenged orders are not among those included in the list of appealable judgments and orders set forth in section 904.1 of the Code of Civil Procedure, an order is appealable if it is essentially a final judgment against a party growing out of a matter collateral to the main proceeding, which either directs the appellant to pay money or directs some action be taken by or against the appellant. (*Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545–1546.) In the peculiar procedural posture of the underlying proceeding, the only issue before the trial court was whether to issue the abatement warrant and authorize the demolition. Once issued, the court's order was final. We therefore find the interrelated orders are appealable.

## III.

### MOOTNESS

Because the Owner's fire-damaged building has been demolished, the only issue remaining between the parties is whether the City can proceed to assess and recoup its costs of abatement against Owner. We invited the parties to submit supplemental briefing on the issue of mootness and this court's discretion to hear the appeal. In that supplemental briefing, both parties agreed this appeal is Owner's only avenue to challenge the validity of the abatement warrant pursuant to which the City will seek to recoup its abatement costs. We therefore exercise our discretion to decide the validity of the abatement warrant and the extension of it. (See *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th

21

473, 479–480 [appellate court has discretion to decide moot appeal when, among other things, there may be a recurrence of the controversy between the parties, or a material question remains for the court's determination].)

IV.

ANALYSIS

A. *Nuisance Abatement Law*

A city's legislative body may, by ordinance, declare what constitutes a nuisance. (Gov. Code, § 38771.) There are three remedies available to a public agency when a public nuisance exists: (1) a criminal proceeding; (2) a civil action for an injunction, appointment of a receiver, or damages; or (3) abatement. (Civ. Code, § 3491.) With limited circumstances not relevant here, a public entity is free to choose any of the three options. (*Flahive v. City of Dana Point* (1999) 72 Cal.App.4th 241, 244.) Public authorities may demolish a building or other structure if necessary to abate a public nuisance. (*City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 103.) But absent consent or exigent circumstances, government officials must obtain a warrant before entering private property to abate a nuisance. (*Gleaves v. Waters* (1985) 175 Cal.App.3d 413, 419.)

The abatement warrant in this case was issued pursuant to section 1822.50 et seq. of the Code of Civil Procedure, which governs inspection warrants but has been extended by the common law to apply to abatement warrants. (*Flahive v. City of Dana Point*, *supra*, 72 Cal.App.4th at p. 246, fn. 8.). Under section 1822.51, an inspection warrant will issue only "upon cause, unless some other provision of state or federal law makes another standard applicable. An inspection warrant shall be supported by an affidavit, particularly describing the place, dwelling, structure, premises, or

22

vehicle to be inspected and the purpose for which the inspection is made."
(Code Civ. Proc., § 1822.51.) Cause is deemed to exist "if . . . there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, [or] premises." (*Id.*, § 1822.52.)

"Before issuing an inspection warrant, the judge may examine on oath the applicant and any other witness, and shall satisfy himself of the existence of grounds for granting such application." (Code Civ. Proc., § 1822.53.) "An inspection warrant shall be effective for the time specified therein, but not for a period of more than 14 days, unless extended or renewed by the judge who signed and issued the original warrant . . . ." (*Id.*, § 1822.55.) The municipality has the burden of proving the existence of the nuisance and the necessity for its abatement. (*Leppo v. City of Petaluma* (1971) 20 Cal.App.3d 711, 718.) An inspection warrant must be executed and returned to the judge who issued it within the time specified in the warrant or within the extended or renewed time. (Code Civ. Proc., § 1822.55.)

Because destruction of property is a drastic remedy, it is necessarily a remedy of last resort. (*Hawthorne Savings & Loan Assn. v. City of Signal Hill* (1993) 19 Cal.App.4th 148, 161 (*Hawthorne*).) "The official duty of the city in a case in which they seek to abate a nuisance is to afford the property owner a due process hearing which consists of an opportunity to be heard [to determine whether the property constitutes a public nuisance] [citation] and a determination upon competent sworn testimony." (*Leppo v. City of Petaluma, supra,* 20 Cal.App.3d at p. 717.) Except in limited circumstances, the government may only demolish a building where "'in fairness and in justice there is no other way reasonably to correct the nuisance.'" (*Id.* at p. 718.) Due process requires that a city give the property

23

owner an opportunity to correct the defects or repair the structure prior to demolition. (*D & M Financial Corp. v. City of Long Beach* (2006) 136 Cal.App.4th 165, 174–175 (*D & M*); *Hawthorne, supra,* at pp. 158–160, 162.)

## B. *Owner's Due Process Challenge to the Abatement Warrant*

As an initial matter, we underscore that Owner does not dispute the existence of a nuisance on the Property or contend it did not receive notice and an opportunity to be heard regarding whether the structure constituted a nuisance. Owner also does not dispute it received notice the City intended to demolish the structure if Owner did not take action itself to abate the nuisance, and that the City gave it a reasonable opportunity to elect to brace and repair the Property in lieu of demolition. Owner acknowledges it opted to demolish the Property, rather than repair it, and notified the City of its decision.[7]

Nevertheless, Owner asserts the City deprived it of due process *after* Owner had been given notice and an opportunity to be heard and elected not to repair the structure. Owner's due process argument rests on the theory that, once it elected demolition over repair, it continued to have a due process right to perform the demolition itself in order to minimize or reduce the costs of demolition. We find no deprivation of due process.

First, none of the California cases on which Owner relies supports Owner's argument that due process extends beyond a property owner's right to notice and an opportunity to be heard, and the right to repair its property

---

[7] Although Owner suggests it felt pressured to choose demolition because the City's timeline for bracing and repair was not feasible, Owner does not challenge the need for demolition or dispute that it ultimately elected demolition over repair.

prior to demolition (i.e., the ability to show that other less drastic means exist to abate the nuisance). In *D & M, supra,* 136 Cal.App.4th 165, the court explained a property owner has a due process right to receive notice that the municipality intends to demolish a structure and the "opportunity to *repair defects at the property.*" (*Id.* at pp. 170, 174, italics added.) Specifically, the court explained: "When a city threatens demolition of structures, due process also requires the city to give a property owner the opportunity to *correct defects or repair a structure* constituting a nuisance before demolition." (*Id.* at pp. 175, 184, italics added; see *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 933–934 [California law requiring that a property owner be given the choice of repairing or demolishing "merely prohibits an enforcement agency from ordering an owner to demolish a substandard building without first affording the owner the choice and a reasonable opportunity *to repair the building instead*" (italics added)].) *D & M* does not support Owner's contention that once a property owner has elected not to repair the property and instead agrees to demolition, the property owner has a due process right to perform the demolition itself to control abatements costs.

Whether a property owner has a due process right to demolish its own property also was not at issue in *Hawthorne, supra,* 19 Cal.App.4th 148. Rather, the issue was whether the city had given the current property owner "the opportunity to choose repair over demolition" and sufficient time to evaluate whether to attempt to repair the property before demolition. (*Id.* at pp. 160–161.) Unlike this case, the property owner in *Hawthorne* produced evidence that its property could be repaired and that it was prepared to make the repairs. (*Id.* at pp. 157–158.) The court held that "prior to ordering demolition, the City had a constitutional and statutory duty to first afford

25

Hawthorne the choice of repairing or demolishing the buildings, a reasonable time in which to make that choice and, *if [the Owner] chose to repair, a reasonable opportunity to do so.*" (*Id*. at p. 158, italics added.)  The court characterized a property owner's right as freedom "from an unconstitutional taking of its property." (*Id*. at p. 157.)  *Hawthorne* did not decide that a property owner who elects not to repair has a constitutional right to conduct the demolition itself in order to control costs.  Owner has failed to show that, once a property owner has agreed to demolition and opted not to repair, demolition by the City is a taking subject to constitutional scrutiny.

We are not persuaded by Owner's reliance on *Miles v. District of Columbia* (D.C. Cir. 1975) 510 F.2d 188 (*Miles*).  *Hawthorne* is the only California court that has cited *Miles*.  In *Hawthorne*, the court reiterated the general proposition that one of the constraints due process imposes on a municipality's ability to order a structure demolished is "'that in fairness and in justice there is no other way reasonably to correct the nuisance.'" (*Hawthorne, supra,* 19 Cal.App.4th at p. 159.)  Like *D & M* and *Hawthorne*, *Miles* involved the issue of notice and a property owner's *right to repair*—not whether a property owner had the right to conduct the demolition itself.  The language in *Miles* quoted by the *Hawthorne* court (and relied upon here by Owner) that a municipality must give the owner "'ample opportunity to demolish the building himself'" (*Hawthorne*, at p. 159) is not only dicta, but dicta that relies only on a treatise.  After citing *Miles*, the *Hawthorne* court cited another out of state case it considered more analogous to the facts before it, which, according to the *Hawthorne* court, held "demolition of the property without giving the owner a *reasonable opportunity to bring the building into*

26

*conformity with the housing code* was a denial of due process." (*Hawthorne, supra*, at p. 159, italics added.)

Notably, in the residential context, California has codified the property owner's constitutional right to choose repair or demolition. (Health & Saf. Code, § 17980, subd. (c)(1).) As explained in *Hawthorne, supra*, 19 Cal.App.4th, the law places "reasonable conditions on that choice in order to protect the public interest in the abatement of substandard buildings. These conditions include the requirements the owner exercise the choice to repair or demolish in a timely manner and develop a 'reasonable and feasible schedule for expeditious repair.' In addition, the repair work must be done on schedule. If the owner fails to comply with these conditions, the municipality may itself demolish or repair the buildings." (*Id.* at p. 160, citing Health & Saf. Code, former § 17980, subd. (b).)

Here, the City afforded Owner ample opportunities, over a reasonable period of time, to elect to brace and repair the damaged structure, and gave notice to Owner that the City intended to demolish the structure if Owner failed to abate the nuisance. After months of professed indecision, Owner chose not to attempt repair and, instead, agreed the Property should be demolished. We therefore conclude that, "[u]nlike the situation in *D & M Financial*, no violation of due process appears in this case because [Owner] was provided 'with notice, with the opportunity to be heard, and with the opportunity to correct or repair the defect before demolition.'" (*City of Santa Monica v. Gonzalez, supra,* 43 Cal.4th at p. 929.)

Even assuming the City had the burden, on its application for an abatement warrant, to show that it gave Owner a reasonable opportunity to conduct the demolition itself, there was substantial evidence before the trial

27

court that the City did so. Over a period of many months—and in the face of dangerous conditions at the Property that posed serious public safety concerns—the City repeatedly communicated with Owner, explained its options, urged Owner to act promptly because time is of the essence, and provided Owner information about the steps it would have to follow. The City made clear more than once that if Owner did not work expeditiously and in good faith, the City would step in and perform the demolition at Owner's expense. Despite all of the City's exhortations, Owner was often slow to respond or promised imminent responses or action but did not follow through. The evidence supports a conclusion that Owner was dragging its feet (perhaps to buy time to resolve its dispute over insurance coverage for the fire damage) and being less than forthcoming with the City. In short, there is substantial evidence the City gave Owner at least a reasonable opportunity to initiate steps to conduct the demolition itself and Owner failed to do so. The City was not obliged by due process principles to indefinitely allow Owner to dictate the timetable for the abatement of the nuisance or delay the demolition until the Owner decided it was ready to act.

There also was substantial evidence supporting a conclusion the City acted reasonably in ultimately declining to issue the demolition permit to Owner and insisting on pursuing a parallel demolition process in the event Owner did not follow through on its professed intention to proceed with a prompt demolition. In light of the months of delays, inactivity, excuses, and unfulfilled promises by Owner and the continued public safety issues posed by the condition of the Property, it was not unreasonable for the City to insist on having a parallel plan in place that would enable it to immediately step in to abate the nuisance if, at the end of the 75-day period in which Owner claimed

28

it would complete the demolition, Owner again had failed to perform. Courts have found that delays and denials of permits by municipalities do not constitute a violation of due process. (See *Clark v. City of Hermosa Beach, supra,* 48 Cal.App.4th at p. 1185.) Moreover, there is substantial evidence that by the time the City conditioned a demolition permit on Owner's willingness to enter into a second agreement, the City had already fully complied with Owner's due process rights by giving Owner the opportunity to choose whether to repair or demolish the structure. The City was not required to do more.

In sum, the record before us shows the City provided Owner an administrative hearing and more than a reasonable time to choose between repairing or demolishing the Property. Once Owner elected demolition, the City gave Owner ample time to abate the nuisance itself before the City sought the abatement warrant and then took steps pursuant to the warrant to demolish the damaged structure. Owner had actual notice of the City's intent to demolish the building at Owner's expense if Owner did not take action to repair or abate it itself, and Owner had more than a reasonable time within which to challenge the City's findings or act to abate the nuisance itself. The City did not deprive Owner of its due process rights by refusing to allow it to indefinitely delay and derail the necessary abatement process.

## DISPOSITION

We affirm the trial court's orders.  Respondent shall recover costs on appeal.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.